MARATHON OIL COMPANY, Appellant,

v.

James E. STERNER, Appellee.

No. 17926.

Court of Civil Appeals of Texas, Houston (1st Dist.).

May 21, 1981.

Rehearing Denied June 18, 1981.

Mills, Shirley, McMicken & Eckel, Ross Citti, Galveston, for appellant.

Brown & Todd, Gordon Davenport, Alvin, for appellee.

Before COLEMAN, C. J., and WARREN and PEDEN, JJ.

PEDEN, Justice.

Marathon Oil Company appeals from a judgment based on jury findings awarding James E. Sterner $25,000 for personal injuries arising out of an accident on Marathon's premises. Mr. Sterner, a boilermaker employed by an independent contractor, alleged that he was overcome by gas while working in a large metal vessel in a unit of Marathon's plant.

In response to four special issues the jury found that 1) Sterner sustained an injury on November 15, 1975, on Marathon's premises, 2) the escape of gas or gasses was due to the negligence of Marathon, 3) such negligence was a proximate cause of Sterner's injuries, and 4) $25,000 would fairly and reasonably compensate him.

Marathon asserts that there is no evidence that it was negligent in any manner proximately causing the injury and that the trial court erred in instructing the jury on the elements of *res ipsa loquitur*. Based on these assertions of no evidence, Marathon contends that the trial court erred in submitting its second, third, and fourth special issues and this instruction on *res ipsa loquitur*:

> You are instructed that you may infer negligence by a party but are not compelled to do so, if you find that the character of the accident is such that it would ordinarily not happen in the absence of negligence and if you find that the instrumentality causing the accident was under the management and control of the party at the time the negligence, if any, causing the accident probably occurred.

This is the instruction suggested in Justice Sears McGee's authoritative opinion on the application of the doctrine of *res ipsa loquitur* in Texas, *Mobil Chemical Company v. Bell*, 517 S.W.2d 245, at 257 (Tex.1974). Marathon did not object at the trial to the inclusion of this instruction in the court's charge, and it does not attack the first jury finding: that Sterner sustained an injury while on Marathon's premises on November 15, 1975.

Marathon's third point of error presents the real question in this case. It asserts: There is no evidence that the instrumentality in question (Marathon's vessel) was under the management and control of Marathon at the time of plaintiff's alleged accident and injuries or that the character of the accident and the circumstances attending it were such that the accident would not have occurred absent Marathon's negligence so that the trial court erred in submitting this case to the jury on the theory of *res ipsa loquitur.* *Mobil Chemical v. Bell, supra,* included these statements:

[I]n any *res ipsa* case, the particular facts surrounding the event are extremely important.

The *res ipsa* doctrine is applicable when two factors are present: (1) the character of the accident is such that it would not ordinarily occur in the absence of negligence; and (2) the instrumentality causing the injury is shown to have been under the management and control of the defendant. . . . The first factor is necessary to support the inference of negligence and the second factor is necessary to support the inference that the defendant was the negligent party. . . . As such the "control" requirement is not a rigid rule that the instrumentality must have always been in the defendant's possession or even that it must have been in the defendant's control at the time of the injury. . . . It is sufficient if the defendant was in control at the time that the negligence inferable from the first factor probably occurred, so that the reasonable probabilities point to the defendant and support a reasonable inference that he was the negligent party. . . . The possibility of other causes does not have to be completely eliminated, but their likelihood must be so reduced that the jury can reasonably find by a preponderance of the evidence that the negligence, if any, lies at the defendant's door. . . .

In Texas it is well settled that *res ipsa loquitur* is simply a rule of evidence whereby negligence *may* be inferred upon proof of the factors stated above. . . .

. . . .

[T]he effect of successfully invoking the *res ipsa* doctrine is that the plaintiff can survive no-evidence procedural challenges—he has produced some evidence of the defendant's negligence. He is in the same position as any other plaintiff who has made out a case for the jury. No presumption of the defendant's negligence arises; the jury is merely free to infer negligence. . . . The plaintiff continues to have the burden of persuading the jury by a preponderance of all the evidence that the defendant was negligent. . . .

In order to rely on the *res ipsa* doctrine, the plaintiff must produce evidence from which the jury can conclude, by a preponderance of the evidence, that both the "type of accident" and "control" factors are present. This is not so much a rule of law as it is a rule of logic—unless these factors are present, the jury cannot reasonably infer from the circumstances of the accident that the defendant was negligent. In a great many cases the plaintiff can rely upon general knowledge to prove the accident in question is the type of accident which does not ordinarily happen in the absence of negligence. . . . The plaintiff must also prove that the instrumentality was under the management and control of the defendant. . . . As previously discussed, this requirement must be interpreted in the factual setting of each case. Disputes may arise as to what instrumentality caused the injury, when the negligence, if any, occurred, and who was in control at that time. In any event, the plaintiff must produce evidence from which the jury can reasonably conclude that the negligence, if any, is attributable to the defendant.

. . . .

While the plaintiff must produce evidence enabling the jury to reasonably conclude that the two required factors are present, this does not mean that issues inquiring about these factors must or should be submitted. The pertinent question for the jury's determination is

whether the defendant was negligent.... The "type of accident" and "control" factors are just subissues of this ultimate issue.... If the trial court is satisfied that there is probative evidence of both factors, he should ask the jury whether the defendant was negligent. A finding of negligence necessarily includes findings that the accident would not ordinarily occur in the absence of negligence and that the defendant was in control of the instrumentality at the appropriate time.... (citations omitted throughout).

■ In reviewing no evidence points we view the record in the light most favorable to the judgment, considering only the evidence and reasonable inferences which tend to support the judgment and disregarding all evidence and inferences which would tend to vitiate it.

In our case the plaintiff pleaded both *res ipsa* and a specific act of negligence.

It was undisputed that the vessel in question was located on Marathon's premises and that the accident occurred during a "turnaround" operation, at which time a plant shuts down one of its units for repair or maintenance work. Plant owners usually take bids from contractors for such jobs, since the plants ordinarily have insufficient manpower to conduct them. Mr. Sterner was in the employ of an independent contractor, Morrison Construction Company.

Under the chain of command on a turnaround job, a crew of three to ten men like Sterner takes orders from a subforeman or pusher, who reports to the general foreman, and the general foreman reports to the job superintendent. All of these supervisors work for the contractor, and the contractor gets its orders from the plant owner (Marathon). Marathon's instructions came to Sterner through his pusher; there is no interaction between workers like Sterner and the Marathon people.

Sterner testified that the contractor's men never turn off the valves running to the vessels in which he works on turnaround jobs; the employees of the plant (Marathon, in this case) do that, and they "blind off" the lines before he gets there.

Blinding off is done by disconnecting the flanged side of a valve on a line leading to a vessel, sliding a piece of metal between the flange and the valve, then bolting it back together so that nothing can go through the line.

Marathon's safety personnel are also responsible for purging and checking the vessels at the plant and for issuing safety permits; the contractor has nothing to do with these activities. The safety check is always done before the contractor's employees arrive. The contractor's pusher or general foreman goes to the Marathon safety man for a permit if one is not already posted on the vessel to be worked on, and the plant safety personnel come and check the vessels for harmful gasses with an instrument known as a "sniffer." There was evidence that crew workers like the appellee must rely on the safety men to purge or blind off the tanks before work begins, and if the safety permit indicates that the tank is safe, they must rely on it. Workers are not allowed to enter any vessel unless it has a permit issued by Marathon displayed on its side.

Sterner stated that the November 15, 1975, turnaround appeared to be no different from any other. His pusher, Eddie May, told him and the man he was working with, a Mr. Keeler, to install internal manway covers on the tank in question. The Marathon safety man had inspected and okayed the vessel; it had a Marathon safety permit covering Sterner's particular shift and the work he was doing.

Sterner testified that on the day of the accident he and Keeler had been working since about noon on sealing the interior manway of a steel vessel forty-five to sixty feet high at the Marathon plant. The interior of this vessel contained three or four trays that go all the way across the vessel. He was putting a tray in a manway while Keeler remained on top as a "hold man." You can't enter a vessel unless you have a hold man on the outside to help if you get hurt or sick. While Sterner was taking his turn working inside the vessel at 4 to 4:30

P.M., he smelled an odor like sour or rotten musk oil. He ignored it for ten or fifteen seconds, but it became stronger, and he developed a severe headache, began dry heaving, and defecated on himself. He yelled to Keeler, who was standing about half-way inside the vessel. Keeler immediately started out and yelled for Sterner to come out. Sterner climbed out, vomited, and climbed down the outside ladder to the ground; Keeler also descended to the ground successfully. Jack R. May, Marathon's chief safety engineer, was called to the scene. After May and the safety people had checked out the vessel, May said that there "was something in there" but that he wouldn't know what it was until they had checked it out properly. May had the vessel roped off to prevent anyone else from working in it for the rest of the shift. The following day Keeler consulted Dr. McLarty for continuing nausea, diarrhea, and headaches.

Although the plaintiff couldn't identify the exact vessel in question, his other testimony about the time, date, place, and events of the accident was corroborated by Keeler and by Jack May, the safety engineer.

Keeler testified that the accident happened in vessel 2–V234 at around 4:30 on November 15, 1975. He stated: "We got gassed, and we came down. We were throwing up. The safety man from Marathon came up, took a sniff test in the tower, and shut it down, told us not to go back in." Keeler said that he smelled an odor partly like musk and partly like gas at the time. He said it evidently was confined inside the tower and was what made him sick. He was sick the next day, and his chest still bothers him. He and the appellee were laid off following the incident, and Keeler missed a week from work. He recalls that a safety permit was on the vessel and that the Marathon safety man had sniffed it out before they started work.

Jack May testified by deposition that the appellee pointed out to him the gas concentration unit, number two stripper tower, identification number 14V127, as the vessel

Sterner believed to be involved in the accident. In response to additional questioning, however, he said that he did not recall that the incident made the basis of this suit occurred on the gas-con unit. His recollection is that it occurred in the water still tower (the UDEX unit), and 2V234 "sound[ed] about right" as to that tower's identification number. The gas-con vessel (number 14V127) is used to separate light hydrocarbons such as butane, propane, ether, and methane, and the UDEX unit (number 2V234) produces benzine, toluene, and xylene gasses. All of these are harmful gasses under certain circumstances, and the same safety precautions were taken by Marathon's personnel for both the gas-con and the UDEX units. He said that in regular turnarounds "the entire unit would be blinded off from the field or other units...."

To summarize, the accident occurred in a closed system. The gas smell appeared suddenly while Sterner was working 20 to 22 feet down in the tank in a manway three or four feet in diameter by 100 feet long; no air mover was in use. The smell was "weird" and reminded both Sterner and his co-worker, Keeler, of a sour or rotten musk oil cologne; Sterner was not wearing cologne at the time. The jury could have inferred that one or more lines to the vessel were not properly blinded or that Sterner inhaled gasses from a pocket of gas that was not detected by the sniffer before he went into the vessel.

■ Marathon tried the case on the theory that when a vessel such as that in which the plaintiff was working is properly blinded off and the lines are purged, it is not possible for gas or other substances to enter it. Under that theory, if gas does escape and a person is injured, it indicates either that the vessel was not blinded off or that it was not purged properly. Marathon's safety engineer testified that Marathon had records which would show whether or not the standard blinding and purging safety procedures had been followed for the unit containing both of the vessels where the plaintiff may have received his injury, yet

Marathon did not introduce any such reports into evidence. When a party has evidence in his possession and fails to use it, it may be inferred that such evidence would have been unfavorable. 23 Tex.Jur.2d 142, Evidence § 104.

 We hold that the jury was entitled to conclude that the accident was one that would not ordinarily happen absent negligence and that the vessel and the lines leading to it were under the control of Marathon when the negligence probably occurred. We overrule the appellant's third point of error.

> Marathon's first and second points are: There is no evidence that the vessel in question was not properly flanged off to prevent the entry of gases, or that Marathon Oil Company was negligent in any other manner proximately causing injury to the plaintiff so that the trial court erred in overruling Marathon's motion for instructed verdict, in submitting special issues No. 2 and 4 to the jury, and in denying Marathon's motions for judgment *non obstante veredicto* and for new trial.
>
> There is no evidence that any act or omission of the defendant proximately caused plaintiff's alleged accident and injuries and the trial court therefore erred in overruling defendant's motion for instructed verdict, in submitting special issue No. 3 to the jury and in overruling defendant's motions for judgment *non obstante veredicto* and for new trial.

By these points Marathon challenges the jury's right to find that the escape of gasses was due to Marathon's negligence and that such negligence proximately caused the injury to Sterner. "No evidence" again is the standard of review.

 Marathon denied throughout the trial that any injury occurred either to the plaintiff or to his co-worker and that if they became ill it was due to sickness and not gas exposure. We hold that the evidence we have noticed was sufficient to show that both of the identified vessels contained harmful gasses and that the gasses in vessel 2–V234 probably caused Sterner's injuries. No useful purpose would be served by detailing the testimony as to Sterner's continuing medical problems that began or became aggravated by the injury whose occurrence is not challenged. We also hold that the jury could reasonably have found from the same evidence that the plaintiff's injury from gas inhalation was proximately caused by Marathon's negligence.

Affirmed.